## BLACKWOOD v. EADS.

### Opinion delivered March 13, 1911.

1. NEW TRIAL—DISCRETION OF TRIAL COURT.—Trial courts have large discretion in the matter of granting new trials, especially upon the

weight of the evidence, and the Supreme Court will not interfere with such discretion unless it be made to appear that it was improvidently exercised. (Page 310.)

2. SAME—DISCRETION OF TRIAL COURT.—Where there is substantial or decided conflict in the evidence, the Supreme Court will not review the action of the trial court in granting a new trial because the verdict was against the weight of the evidence. (Page 311.)

Appeal from Phillips Circuit Court; *Hance N. Hutton,* Judge; affirmed.

### STATEMENT BY THE COURT.

From July, 1908, to November 14, 1908, the appellant, who was plaintiff in the court below, was in partnership with one Jacob Thompson, Jr., of Helena, in the real estate brokerage business, under the firm name of Blackwood & Thompson, and on the 9th of October, 1908, the appellee and his co-owner, McAlexander, decided to sell their plantation in Tunica County, Mississippi, for thirty-five thousand dollars. Appellee listed the said place with the appellant's firm under a verbal contract, by which it was agreed between the appellant, on behalf of his firm, and appellee, for himself and his co-owner, that appellee should pay appellant's firm five per cent. commission for selling their plantation. The appellee in the said verbal contract reserved the right of himself and McAlexander to sell the place themselves without paying any commission to appellant. The appellant, before the plantation was sold, bought out Thompson, and succeeded to the business and assets of the firm of Blackwood & Thompson. Appellant advertised the plantation for sale, and in other ways sought purchasers for it. He notified appellee by letter of what he had done. About October 10, 1908, he went to the office of Chew, who afterwards purchased the place, and asked him to buy it. He priced it to Chew at $35,000, and talked it over with him fully, and interested him in the plantation. Chew said he was not in the market at that time to buy a place, but wanted to lease one. Appellant wrote to appellee, and told him in the letter that he had priced the place to Chew and considered him a customer. Appellant within four or five days before November 24, 1908, figured with Chew about buying the place. Chew was able financially to buy. He was going away and seemed to want to wait till he returned, and to talk to appellant again. Appellant

had a conversation with appellee four or five days before November 24, 1908, and appellee did not at that time withdraw the sale from appellant, but told appellant not to do anything until he, appellee, told him, appellant, further about it. In this conversation appellee asked appellant if he had a customer, and appellant replied that he had talked to Mr. Chew. The conversation just alluded to was on the 18th or 20th of November, 1908. There was no one present except appellant and his stenographer. Appellee invited appellant out into the hall, and the above conversation took place. Appellant did not tell appellee positively at that time that Chew was a customer, but that he was considering Chew as a prospective customer, and then appellee told him, appellant, not to do anything further about it until he, appellee, saw appellant again. Within three or four days after that appellee sold the place to Chew and Govan. Some time within two weeks after the 24th of November, 1908, appellant learned that the plantation had been sold. Chew told him about it. On November 24, 1908, appellee came to the office of appellant, and told appellant that he was going to take the sale of the plantation out of his hands. Appellant objected in a way because he told appellee that he thought he would sell it to Chew, but appellee did not leave appellant any opportunity in the matter. Appellee proposed to pay appellant the expense incurred while the plantation was in appellant's hands for sale, and appellee paid appellant the sum of $4.30, and appellant then wrote and gave appellee the following receipt: "November 24, 1908. Received of W. P. Eads four and 30-100 dollars, total expenses in advertising land for sale of W. P. Eads and A. S. McAlexander, while the property was with us for sale, and which is now withdrawn." Signed, "Blackwood & Thompson, H. S. B."

Appellant thought at that time that appellee had taken the land off the market. Appellant told appellee that he was sorry that appellee had taken the place off the market because he was expecting to sell it to Mr. Chew. The stenographer of appellant, Miss Royal, was present November 24, 1908, when the conversation took place in regard to taking the plantation off the market and reimbursing appellant for his expense in advertising. She heard the conversation. The stenographer testified that Mr. Eads called to see Mr. Blackwood at one time when he was out

and told her, while he was waiting for his return, he had decided to take this farm off the market. Mr. Blackwood came in, and Mr. Eads told Mr. Blackwood that he wanted to take the place off the market, and asked him what his expenses were for advertising, which she thought he said was $2.20. Mr. Blackwood told Captain Eads that he was sorry that he was going to take the place off the market just then as he had Mr. Chew interested in the purchase of the place, and he thought if he would leave the place with him for a few days longer he could sell it to Mr. Chew, but Mr. Eads replied that he was going to take the place off the market.

R. E. Chew testified substantially as follows: that appellant, quite a while before he, Chew, and Mr. Govan bought the place, came to him and told him that he had the place for sale, and he told him he was not in the market for it, but that he might lease it; said he was busy with the Higgins place at that time. After he got through with the Higgins place appellant again mentioned the matter to him, and he told appellant that he might consider it. The first information he had about the place being for sale was from appellant. He told his partner Govan that the Eads place was for sale. They met Eads on the street and made a date to go and look at the place. They decided to buy it. It was quick work. Chew gave a check payable to the order of Govan for $10.00, which Govan indorsed to appellee, and appellee then gave them his receipt or contract showing the contract of sale. It was dated November 20, 1908, and showed the terms of the sale. The amount of the purchase price was $35,000. Mr. Eads said he was going over to see Mr. Blackwood, but at that time something was said between him and Mr. Eads about Mr. Blackwood having been the agent for the sale of the place, and he, witness, told Mr. Eads that he was sorry that he had overlooked the fact that it was in Blackwood's hands, that he believed he could have saved something by buying it from him. The parties did not want it known, as the deed had not then passed, and Mr. Eads said he had rather it would not be known, that he did not want Mr. Blackwood to know it. Witness did not mention the fact that Blackwood had spoken to him in regard to the place, and he had forgotten at the time that it had been mentioned to him by Mr. Blackwood. He could not say that before saying

anything to Mr. Eads about it, just prior to the time, it was in his mind that the place was for sale. Govan testified that Chew told him the Eads place was for sale. The day he saw Mr. Chew and Mr. Eads' together he tried to rent or lease the place, and Eads said he wouldn't lease it, but would sell it, and Mr. Chew said: "Suppose you go over and look at it," and they set a day and went over it.

Appellee testified that he said to Blackwood when he listed the place with him for sale: "When you have a prospective buyer, notify me, so we will not get hold of the same purchaser." That he never received from Blackwood any verbal or written notice that Mr. Chew was in the market for the place. That the only letters he had received from Blackwood and Thompson in regard to prospective purchaser was the one in which they stated with reference to Mr. Pouncey and Dr. Cartwright. That the first he knew Mr. Chew wanted to lease it. He told him that McAlexander did not want to lease it, that they wanted to sell it. That Mr. Chew said he would go over there and look over it with him. That they all three went over there one day, and looked over the place, and made a trade, and confirmed it in Helena, and talked to McAlexander over the telephone. That on the 18th of November he went to Mr. Blackwood's office; that he did not tell him that he did not want to sell the place, but that he was going to take it out of his hands. That he had no recollection of Mr. Blackwood saying anything about Mr. Chew being a prospective buyer.

He further testified as follows: "I went to their office and listed the place with them. Once when Mr. Thompson was there I listed the place with them. There was a lady there, and when I went back there was some lady there then, and I called him out in the hall, and I withdrew the place from his hands, and afterwards I went back there to his office, and paid him what he was out for advertising when the place was listed with him for sale. Paid him $4.30. When I went up there and asked him how much it was, and said I wanted to pay him, he said he would make it out, and I went back up there in a few days, and he had it made out, and I paid him."

He also said he had no recollection of Mr. Blackwood saying anything about Mr. Chew, and if he said anything about him he

would have remembered it.  He says: "I know that I called
him out and asked him if he had a prospective purchaser, or pros-
pect of selling the place to any of the parties he had notified me
about and he said he had not."

The appellant sued for a commission of $1,750 with 6 per
cent. interest and appellee denied liability. ' The above are the
facts.  The court instructed the jury, and they rendered a verdict
in favor of appellant.  Motion for new trial by appellee was sus-
tained.  Appellant appeals, stipulating for judgment absolute in
favor of appellee if the order granting a new trial be affirmed
by this court.

*Moore & Vineyard* and *Bevens & Mundt*, for appellant.

1.  The court erred in setting aside the verdict and granting
a new trial, because, on a review of the evidence adduced at the
trial, it clearly appears that the verdict is not only not contrary
to the evidence, but the preponderance of the testimony clearly
sustains it.

2.  In order to entitle a broker to his commissions, it is not
necessary for him to have formally introduced the purchaser to
the seller, nor that the broker should have made the sale himself,
nor even was it necessary that he should have advised the seller
of the name of the purchaser.  53 Ark. 49; 84 Ark. 468; 76 Ark.
375; 4 Am. & Eng. Enc. of L. 980; 19 Cyc. 264; 89 Ark. 205;
77 Pac. (Kan.) 104; 158 Fed. 277; 78 N. E. (Mass.) 560; 98
. S. W. (Tex.) 943; 95 S. W. (Tex.) 86; 78 N. W. (Neb.) 498;
Rapalje, Real Estate Brokers, 200-201.  If he was the procuring
cause of the sale, that entitles him to commissions, and to consti-
tute such procuring cause all that is necessary is that through
his efforts, disclosures or advertisements the seller and purchaser
were brought together and the sale resulted from such meeting.
88 S. W. (Mo.) 157; 81 Pac. (Cal.). 1015.

3.  The discretion of a trial court to set aside a verdict and
grant a new trial is by no means absolute; and where it is done
on the weight of the testimony, the test of the correctness of the
court's action is:  After drawing all the inferences most favor-
able to the verdict that the evidence will reasonably warrant, is
it sufficient in law to sustain the verdict?  94 Ark. 566.  This
discretion does not mean that a new trial may be granted or
refused at the mere will or pleasure of the trial judge, but that

he is to exercise a sound judicial discretion, in the interest of justice.  10 W. Va. 677; 11 W. Va. 122.

*R. W. Nicholls,* for appellee.

1.  The court could not well do otherwise than grant a new trial, because the verdict was contrary to the law and the evidence. Where, as in this case, a broker did not introduce the purchaser to the seller, did nothing to induce him to buy further than to make an unsuccessful attempt to sell, was in no manner instrumental in the sale, and was in no sense the procuring cause, there can be no liability on the principal for the commissions.  4 Am. & Eng. Enc. of L. (2 ed.) 977, and note 1, 978, and note 2, 981, and note 3, 979; 77 Ark. 375; 33 Ark. 448; 55 Ark. 574; 80 Ark. 254; 91 Ark. 212; 81 Ark. 96; 130 S. W. 524; 82 Ark. 381.

2.  The sound judicial discretion of the trial court to grant a new trial will not be interfered with by this court, where the preponderance of the evidence fails to sustain the verdict.  42 · Ark. 566; 57 Ark. 451; 27 S. W. (Ark.) 1062; 38 Am. St. Rep. 256-7; 127 S. W. 962; Baylies on New Trials, 246.

Wood, J., (after stating the facts).  In *Taylor v. Grant Lumber Co.,* 94 Ark. 566, this court, reviewing an order of the circuit court granting a new trial, said: "The trial judge still has control of the verdict of the jury after and during the term it was rendered.  Because of his training and experience in the weighing of testimony, and of the application of legal rules to the same, and of his equal opportunities with the jury to weigh the evidence and judge of the credibility of witnesses, he is vested with the power to set aside their verdicts on account of errors committed by them, whereby they have failed in their verdict to do justice and enforce the right of the case under the testimony and instructions of the court.  This is a necessary counterbalance to protect litigants against the failure of the administration of the law and justice on account of the inexperience of jurors."  Judge Battle in that case quoted from the Supreme Court of Missouri in *Baughman v. Fulton,* 139 Mo. 557, 41 S. W. 215, as follows: "Trial courts have large discretion in the matter of granting new trials, especially upon the weight of the evidence, and this court will not interfere with such discretion unless it be made to appear that it was improvidently exercised."  "Improvidently ex-

ercised," as used above, means thoughtlessly exercised or without due consideration. Webster, New Int. Dict.: *"Improvidently."*

The Supreme Court of Missouri in the above case further stated as the uniform and settled rule of that State that "the Supreme Court will not, where there is substantial conflict in the evidence, review the action of the trial court in granting a new trial because the verdict is against the weight of the evidence," and stating further that the granting of a new trial for the reason that the verdict is against the weight of the evidence rests peculiarly with the judge presiding at the trial. See also *Rickroad v. Martin,* 43 Mo. App. 597. This is the rule of many jurisdictions, and the rule of this court. *Taylor* v. *Grant Lbr. Co. supra; Moore* v. *Los Angeles Infirmary,* 49 Cal. 669; *McGregor* v. *Christie,* 37 Ga. 557; *Nagle* v. *Hornberger,* 6 Ind. 69; *Roberts* v. *Jones,* 30 Ia. 525. See many cases collated in 3 Supplement Encl. Pl. & Pr. p. 255, under title, "order granting [new trial] rarely reversed."

Where there is decided conflict in the evidence, this court will leave the question of determining the preponderance with the trial court, and will not disturb his ruling in either sustaining a motion for new trial or overruling same. "The Supreme Court will much more reluctantly reverse the final judgment in a cause for error in granting than for error in refusing a new trial." *House* v. *Wright,* 22 Ind. 383; *Oliver* v. *Pace,* 6 Ga. 185. The witnesses give their testimony under the eye and within the hearing of the trial judge. His opportunities for passing upon the weight of the evidence are far superior to those of this court. Therefore his judgment in ordering a new trial will not be interfered with unless his discretion has been manifestly abused.

We would have readily affirmed a judgment in favor of appellant under the evidence adduced. But such deference must be shown the trial court in passing upon the weight of conflicting testimony that his ruling will not be set aside merely because we differ with him on a question of preponderance. *New York Piano Forte Co.* v. *Mueller,* 38 Ia. 552. There were sharp conflicts in the evidence. The testimony of appellee and of Chew would have warranted the jury in returning a verdict in favor of appellee, and, had the jury done so, we could not have disturbed same on appeal. The instructions upon the whole cor-

rectly declared the law, as it has been often announced by this court. *Little Rock* v. *Barton,* 33 Ark. 448; *Scott* v. *Patterson,* 53 Ark. 49; *Hill* v. *Webb,* 55 Ark. 574; *Hunton* v. *Marshall,* 76 Ark. 375; *Featherston* v. *Trone,* 82 Ark. 381; *Branch* v. *Moore,* 84 Ark. 468; *Stiewel* v. *Lally,* 89 Ark. 205; *Blumenthal* v. *Bridges,* 91 Ark. 212. Therefore the only question is, did the court err in granting a motion for a new trial on the facts? and we are of the opinion that it did not, for the reasons above stated. Judgment absolute is therefore entered here in favor of appellee.

HART and KIRBY, JJ., dissenting.